IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| KARLA SOLIS ZUNIGA, § | |
| § | |
| Plaintiff, § | |
| § | |
| VS. § | Civil Action No. 3:23-CV-2308-D |
| § | |
| CITY OF DALLAS, TEXAS, § | |
| § | |
| Defendant. § | |

MEMORANDUM OPINION
AND ORDER

Plaintiff Karla Solis Zuniga ("Zuniga") sues her former employer, the City of Dallas, Texas (the "City"), under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., asserting hostile work environment and retaliation claims. The City moves under Fed. R. Civ. P. 12(b)(6) for partial dismissal, seeking to dismiss Zuniga's hostile work environment claim. For the reasons that follow, the court grants the motion and also grants Zuniga leave to replead.

I

Between July 19, 2021 and August 8, 2023, Zuniga, a female, was employed by the City as a Senior Geographic Information System Technician within the Dallas Police Department ("DPD"), working under supervisor Sergeant Dwight G. Beaty ("Beaty").[1]

---

[1] The court recounts the background facts favorably to Zuniga as the nonmovant. In deciding a Rule 12(b)(6) motion "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).

According to Zuniga's complaint, she was sexually harassed by her colleague, Oladapo Alli ("Alli"), who also reported to Beaty.

The first alleged instance of harassment occurred in early October 2022, when Zuniga informed Beaty about an international trip that she intended to take in December 2022 to meet her boyfriend's family for the first time. Alli was in Beaty's office at the time. Zuniga asserts that Alli "decided to interject himself into [her] vacation request to her boss," offering to take her on the trip and telling her that she "needed a 'Plan B' in case things did not work out with her boyfriend." Compl. (ECF No. 1) at ¶ 23(C). According to Zuniga, Beaty "failed to tell Alli to stop and be quiet," and she left Beaty's office, upset. *Id.* at ¶ 23(D)-(E).

In mid-October 2022, according to Zuniga's complaint, Alli approached her at her cubicle and squeezed her shoulder with his hand. Zuniga turned around and, in a loud voice, told Alli to stop touching her. But Alli ignored her, instead stating that her shoulder felt "bony." *Id.* at ¶ 24(H). Zuniga alleges that, "irate," she loudly warned Alli never to touch her again and to stop talking to her. *Id.* at ¶ 24(I). Other DPD employees allegedly heard Zuniga say this, although Beaty was not in the office.

Zuniga alleges that, on November 15, 2022, Beaty approached her, holding a cell phone with Alli on the speakerphone, and told her that Alli wanted to speak with her. Zuniga repeatedly shook her head no. When Beaty told Alli that she did not want to speak with him, Alli allegedly told Beaty to have Zuniga stop by his office to "see 'Big Daddy' before she left work." *Id.* at ¶ 25(I). According to Zuniga's complaint, she told Alli over the speakerphone to "F--k off, you piece of s--t, stop talking to me like that." *Id.* at ¶ 25(J).

Zuniga informed Beaty that she would "complain"—a term she asserts is DPD parlance for formally complaining to her chain of command—if Alli did not stop his behavior. When Beaty relayed this to Alli, Alli allegedly responded, "If she complains, I am going to say she called me a ni--er." *Id.* at ¶ 25(L)-(M). Zuniga, Beaty, and two other DPD employees heard Alli's response. Zuniga alleges that, a few minutes later, she emailed Beaty's supervisor, stating:

> I am writing to address an issue with Oladapo Alli[] that has been on-going. Today was the "last straw" and I am not going to put up with it anymore. [Alli] stated I should stop by and "see daddy" (referring to himself) before I left the office. I find it very offensive and he has said similar things in the past. There were several witnesses including Sgt. Beaty. Please have Sgt. Beaty address the issue and ensure it never happens again or I will escalate.

*Id.* at ¶ 25(N). The supervisor allegedly never responded. A few minutes after Zuniga sent her email, Beaty responded by email that he would "address this with Alli in the morning." *Id.* at ¶ 27.

Zuniga alleges that, beginning the following day, November 16, 2022, Beaty stopped speaking to her, which was new behavior, considering that Beaty had been "talkative" with her before. *Id.* at ¶ 28(A). She asserts that, at this point, the behavior toward her of Beaty and others in management "turned adverse, even hostile." *Id.* at ¶ 30.

On November 18, 2022 Beaty emailed Zuniga about her December 2022 vacation request and informed her that, if she wanted to take vacation, she would have to take Leave Without Pay. This did not surprise Zuniga, because she had previously taken Leave Without

Pay at Beaty's suggestion. But according to Zuniga, directly on the heels of her complaint about Alli's behavior, Beaty made this leave request much more difficult than her previous one. For instance, in his email, he warned her that taking Leave Without Pay without first receiving authorization "would require a control number to be generated and investigated by [DPD's Internal Affairs Division ("IAD")] for Administrative violations." *Id.* at ¶ 30. Zuniga alleges that this kind of investigation could have led to workplace discipline, up to and including termination. She asserts that she perceived Beaty's warning to be a threat to her employment as a result of her choice to oppose Alli's sexual harassment.

On November 21, 2022 Zuniga submitted a "Citizen Complaint Form" to Detective Bronda Davis of DPD's IAD. Zuniga alleges that, one day later, Beaty emailed her to inform her of additional requirements for her Leave Without Pay request. One requirement was that she send a memo to the Chief of Police detailing her request. Zuniga asserts that she was not required to write such a memo before taking her previous Leave Without Pay, and that when she pointed this out to Beaty, he did not deny it.

On the morning of November 30, 2022, Zuniga allegedly emailed Major Stephen Williams ("Williams"), an officer in her chain of command, to inquire about the status of her leave request. Williams informed her that he would "check to see where the memo was"—which Zuniga alleges calls into question whether Beaty had forwarded Zuniga's memo. *Id.* at ¶ 34. Because Zuniga was allegedly "on pins and needles about the matter," she scheduled a meeting with a DPD Peer Support Coordinator during her lunch break, which lasted several hours. *Id.* at ¶ 35.

Zuniga alleges that Beaty called her on the afternoon of November 30 to inform her that Williams was looking for her. This was the first time she had heard Beaty's voice speaking to her since November 16, and after this phone call, Beaty never spoke aloud to her again. When Zuniga arrived at Williams' office, he instructed her to edit portions of her memo and complete a Leave of Absence Request form, and he informed her that he would get her leave approved the following day. The next day, Williams entered Beaty's office and closed the door. When he left Beaty's office, he allegedly immediately told Zuniga that her leave had been approved.

On December 27, 2022 Beaty allegedly sent Zuniga a message via Facebook Messenger that stated: "I found an old photo of you [emoji]," and provided a URL. *Id.* at ¶ 42 (brackets in original).[2] Zuniga clicked the link, which took her to a webpage requesting that she log into her Facebook account. Zuniga alleges that she was concerned that the link was a phishing attempt by Beaty so that he could attempt to access her personal Facebook account. Zuniga sent a screenshot of Beaty's message to IAD Detective Victor Guzman ("Guzman"), informing him that she believed Beaty had attempted to hack her Facebook account. According to Zuniga, Beaty never disclosed to her how he found the "old photo" of her, nor did he ever provide any business reason to have searched for it.

According to Zuniga's complaint, in December 2022 and January 2023, she encountered numerous difficulties from Beaty related to work projects. On December 23,

---

[2]Although the URL is specified in the complaint, the court has omitted it from this memorandum opinion and order in the interest of privacy.

2022 Beaty assigned Zuniga two tasks via email, which she completed using source material he had attached.  Five days later, Beaty reopened one of the completed tasks and instructed her to use different source material to complete it.  At 10:39 p.m. that night, Zuniga allegedly informed Beaty that the new source material had not been included in his original task email.  Zuniga then redid the task.  According to Zuniga, when she opened her email during business hours the next day, she noticed that Beaty had sent her two emails at 12:48 a.m. and 12:49 a.m., respectively.  These emails instructed her to redo another completed task (which he had reopened), using a format unlike she had ever used before and information he had not provided when he originally assigned the task.  On January 3, 2023, while Zuniga was redoing that task, she allegedly emailed Beaty to ask for clarification, but he never responded.  That same day, Beaty allegedly assigned Zuniga a task for which she had never received training, and he did not respond when Zuniga asked him whether someone could show her how to do the task.

  On January 4, 2023 Zuniga allegedly emailed Beaty to inform him that she had not had time to complete a task for an ongoing project between DPD and the U.S. Drug Enforcement Administration ("DEA"), which needed to be completed for an upcoming meeting with the DEA.  She alleges that Beaty had previously assigned her to this DEA project and told her she was responsible for managing tasks related to it.  According to the complaint, Beaty stated in his response to her email that he was unaware of the task to which she was referring and that "he was unsure why [she] was discussing her tasks with the DEA." *Id.* at ¶¶ 53-54.  Beaty instructed her that, going forward, any request from the DEA or other

outside agencies should be referred through her chain of command. Later that day, Zuniga emailed Beaty, stating:

> I wanted to be sure I was going to be tasked (or not) with updating that [task] for [the DEA]. The fact that you are not speaking to me makes me feel the need to document the work I need to complete. For instance, you have previously assigned me with tasks that I have not bee[n] trained for. I asked for help to complete a task because I have yet to hear from you on that. It appears that you continue to retaliate against me for complaining to IAD about Alli's and your retaliatory behavior.

*Id.* at ¶ 56. The following day, Zuniga noticed that she had been removed from all future meetings with the DEA.

Zuniga alleges that, when she emailed Detective Guzman about these issues, he told her that he could not help her and instructed her to file a grievance through her chain of command. Zuniga did so on January 11, 2023, including a narrative detailing the foregoing incidents involving Alli and Beaty. One month later, a detective conducted a recorded interview of Alli. Alli and the detective discussed the incident involving Zuniga's shoulder, and Alli stated that he had touched Zuniga's arm "to get her attention." *Id.* at ¶ 60(B). But according to Zuniga, the detective did not ask Alli whether he had touched or squeezed Zuniga's shoulders, whether he had ever used the word "bony" in reference to Zuniga's shoulders, whether he had ever used the words "Daddy" or "Big Daddy" while speaking to Zuniga, or whether he had said, "If she complains, I am going to say she called me a ni--er." *Id.* at ¶ 60. DPD allegedly issued Alli a criminal citation for "Assault M/C Offensive Contact" on February 13, 2023. Zuniga alleges that she then had a grievance meeting with

DPD Chief of Police Eddie Garcia ("Chief Garcia") on March 13, 2023, in which she informed Chief Garcia that Beaty had removed her from her DEA project. Although Chief Garcia asked Zuniga if she wished to resume the DEA project and she told him that she did, DPD never put her back on any DEA project.

Finally, Zuniga alleges that, between January 2023 and August 2023, it became "increasingly obvious . . . that DPD management was ostracizing her." *Id.* at ¶ 63. She allegedly did not receive a significant amount of new work, and she reached out to colleagues to ask them if there was any work she could complete for them.

On July 23, 2023 Zuniga filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Three days later, on July 27, 2023, Zuniga tendered her resignation, and her last day of employment was August 8, 2023. She alleges that DPD replaced her with a male. Sometime later, Zuniga filed a second Charge of Discrimination with the EEOC, which is pending.[3]

On October 19, 2023 Zuniga timely filed this lawsuit against the City, alleging under Title VII (1) a hostile work environment claim based on sexual harassment and (2) a retaliation claim. The City now moves to dismiss Zuniga's hostile work environment claim. The court is deciding the motion on the briefs, without oral argument.

---

[3]Zuniga states that her second Charge of Discrimination is pending with the EEOC and that she will add discrimination and retaliation claims to this lawsuit once the EEOC issues a right-to-sue letter. Because these claims are not yet part of this suit, the court has not considered them in deciding the City's motion for partial dismissal.

II

"In deciding a Rule 12(b)(6) motion to dismiss, the court evaluates the sufficiency of [the plaintiff's] complaint by 'accept[ing] all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, 855 F.Supp.2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.) (second alteration in original) (internal quotation marks omitted) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)).  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)) (alteration omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

III

A

To state a plausible Title VII hostile work environment claim based on conduct of a non-supervisor, Zuniga must allege factual content that allows the court to draw the reasonable inference that: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action. *See EEOC v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir. 2007) (citations omitted).

The City does not contest that Zuniga has satisfied the first three elements of a hostile work environment claim. It contends only that she has not plausibly pleaded facts satisfying the fourth and fifth elements. The court considers Zuniga's allegations as to each of the contested elements in turn.

B

1

Regarding the fourth element of the claim—whether the harassment affected a term, condition, or privilege of employment:

> [h]arassment affects a term, condition, or privilege of employment if it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Workplace conduct is not measured in isolation. In order to deem a work environment sufficiently hostile, all of the circumstances must be taken into consideration. This includes the frequency of the discriminatory

> conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. To be actionable, the work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.

*Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (citations and internal quotation marks omitted). The legal standard for workplace harassment is "high," *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir. 2003), and "merely offensive" conduct is not actionable, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "[T]he Supreme Court has warned that these high standards are intentionally demanding to ensure that Title VII does not become a general civility code, and when properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language." *Howard v. United Parcel Serv., Inc.*, 447 Fed. Appx. 626, 632 (5th Cir. 2011) (per curiam) (internal citations and quotation marks omitted) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

In her complaint, Zuniga alleges three incidents of harassment by Alli: (1) when he interrupted her vacation request by offering to take her on the trip himself and stating that she should have a "Plan B" if her relationship with her boyfriend did not work out, Compl. ¶ 23(C); (2) when he squeezed her shoulder and commented that it was "bony," *id.* at ¶ 24(H); and (3) when he told her to "stop by his office to "see 'Big Daddy' before she left work" and then threatened to accuse her of calling him a racial slur if she reported his behavior, *id.* at ¶ 25(I), (M). Zuniga's allegations make it clear that Alli's behavior was subjectively

offensive to her. But her complaint does not plausibly allege that Alli's behavior was sufficiently objectively offensive to plead a plausible hostile work environment claim.

2

First, Zuniga does not allege harassment that was sufficiently severe as to be actionable under Title VII. While an "egregious, yet isolated, incident" can satisfy the fourth element of a hostile work environment claim, it must be "extremely serious" to "amount to discriminatory changes in the 'terms and conditions of employment.'" *Lauderdale v. Tex. Dep't of Crim. Just., Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007) (quoting *Faragher*, 524 U.S. at 788). Notably, "[i]n circumstances where the alleged conduct was either similar, or more objectionable and frequent than" that in which Alli alleged engaged, the Fifth Circuit has held that "non-pervasive conduct involving physical touching—including unwanted touching of intimate body parts"—was not severe enough to be actionable under Title VII. *Paul v. Northrop Grumman Ship Sys.*, 309 Fed. Appx. 825, 829 (5th Cir. 2009) (per curiam); *see, e.g.*, *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328 (5th Cir. 2004) (holding that sexually suggestive comments, slapping plaintiff on the behind with a newspaper, grabbing or brushing up against plaintiff's breasts and behind, and attempting to kiss plaintiff did not constitute severe harassment); *Derouen v. Carquest Auto Parts, Inc.*, 275 F.3d 42, 42 (5th Cir. 2001) (per curiam) (holding that plaintiff's allegations that colleague attempted to grab her breast and later touched and rubbed her thigh and that customers made sexually threatening remarks were not actionable under Title VII). Here, Zuniga has alleged that Alli squeezed her shoulder—an action not nearly as objectively offensive as unwanted touching

of intimate body parts—and that he did so only once and for a short period of time. And Alli's suggestive comments are less severe than comments that courts have deemed non-actionable. *See, e.g.*, *Shepherd v. Comptroller of Pub. Accts. of State of Tex.*, 168 F.3d 871, 874 (5th Cir. 1999) (holding that colleague's comments that plaintiff's "elbows are the same color as your nipples," that she had "big thighs," and that his lap was her "seat" were not sufficiently severe); *Arredondo v. Schlumberger Ltd.*, 583 F.Supp.3d 783, 799 (W.D. Tex. 2022) (holding that colleague's comments that she liked women with "big breasts and big butts shaped like [plaintiff's]" and "would know what to do with a woman like [plaintiff]," and her query whether plaintiff would be willing to try being bisexual, were not sufficiently severe).

3

Second, Zuniga's complaint does not allege harassment that is sufficiently pervasive as to be actionable under Title VII. To be sure, "[f]requent incidents of harassment, though not severe, can reach the level of pervasiveness required under Title VII." *Id.* at 798 (citing *Lauderdale*, 512 F.3d at 163). But being subjected to "one subjectively offensive utterance . . . every few days" is not actionable under Title VII when the utterances "were not severe, physically threatening, or humiliating." *Steward v. Miss. Transp. Comm'n*, 586 F.3d 321, 330 (5th Cir. 2009) (citation omitted). Non-consensual physical touching of the type alleged by Zuniga is "actionable under Title VII only in cases where it was chronic and frequent." *Paul*, 309 Fed. Appx. at 828 (citation omitted). Here, Zuniga alleges three incidents of harassment over the course of two months, each separated from the others by a period of

several weeks. Thus they were even less frequent than incidents in other cases in which courts have found harassment not to be pervasive. *See, e.g.*, *id.* (holding that repeated unwanted fondling and rubbing of plaintiff's breasts and buttocks and unwanted kissing on the cheek over a seven-month period was not sufficiently pervasive). And while Zuniga alleges that Alli's comments "upset" her and made her "irate," Compl. ¶¶ 23(E), 24(I), she does not assert that she felt physically threatened or humiliated. Nor does she plausibly allege facts that would indicate that these incidents unreasonably interfered with her work performance.

Consequently, viewing the totality of the circumstances in the light most favorable to Zuniga, the court concludes that she has not plausibly pleaded the fourth element of her hostile work environment claim.

C

As to the fifth element of Zuniga's claim—whether the City knew or should have known of the harassment and failed to take prompt remedial action—the City does not contest her allegation that it knew or should have known of Alli's harassment; it contests only her assertion that it failed to take prompt remedial action.

When an employer, "once informed of allegations of sexual harassment, takes prompt remedial action to protect the claimant, [it] may avoid Title VII liability." *Hockman*, 407 F.3d at 329 (citing *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 402 (5th Cir. 1993) (per curiam)). "'Prompt remedial action' must be 'reasonably calculated' to end the harassment." *Id.* (quoting *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 615 (5th Cir.

1999)). Whether the employer has taken prompt remedial action depends on the facts of the case, and "[n]ot every response by an employer will be sufficient to discharge its legal duty." *Skidmore*, 188 F.3d at 615 (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 479 (5th Cir. 1989)); *see also Williams-Boldware v. Denton Cnty., Tex.*, 741 F.3d 635, 640 (5th Cir. 2014). "Rather, the employer may be liable despite having taken remedial steps if the plaintiff can establish that the employer's response was not 'reasonably calculated' to halt the harassment." *Skidmore*, 188 F.3d at 615-16 (quoting *Waltman*, 875 F.2d at 479). "Employers are not required to impose draconian penalties upon the offending employee in order to satisfy this court's prompt remedial action standard." *Williams-Boldware*, 741 F.3d at 640 (citation omitted).

Zuniga has failed to plead facts that enable the court to draw the reasonable inference that the City failed to take prompt remedial action to protect her from Alli's harassment. Rather, she alleges that, within ten minutes of Zuniga's first formal complaint about Alli's behavior on November 15, 2022, Beaty responded to her email, stating, "I will address this with Alli in the morning." Compl. ¶ 27. And based on the allegations in the complaint, it appears that Alli's harassment completely ceased at that point. To be sure, Zuniga alleges that the IAD did not formally investigate Alli until February 2023, after she filed additional complaints about Alli's and Beaty's behavior. But the "prompt remedial action" standard requires that the employer take action "'reasonably calculated' to end the harassment," *Hockman*, 407 F.3d at 329 (quoting *Skidmore*, 188 F.3d at 615), not that it take the plaintiff's preferred action or a form of action that the plaintiff personally believes is appropriate.

Because Zuniga's complaint indicates that Beaty responded within minutes to her first complaint and that Alli's harassment ceased immediately after that complaint, it appears that Beaty's promised action of having a conversation with Alli was both prompt and reasonably calculated to end the harassment.

Even if Zuniga alleged that the City did not act promptly because it had notice of Alli's harassment by early October 2022 and yet did not take action until after her November 15, 2022 complaint, this would not be sufficient to satisfy the fifth element. The Fifth Circuit "has long recognized that in order to demonstrate that an employer has failed to take prompt remedial action, the employee must first show that she took 'advantage of [the] corrective opportunities provided by the employer." *May v. Fedex Freight E., Inc.*, 374 Fed. Appx. 510, 512 (5th Cir. 2010) (per curiam) (alteration in original) (quoting *Harvill v. Westward Commc'n, LLC*, 433 F.3d 428, 437 (5th Cir. 2005)). Zuniga's complaint indicates that she did not complain up her chain of command about Ali's behavior after the first incident of harassment in early October 2022 or even after the second incident in mid-October 2022. She therefore has not plausibly pleaded that she used the corrective opportunities available to her after these incidents, meaning that the promptness of the City's remedial action is more appropriately measured from the date of her November 15 complaint.

Consequently, Zuniga has not plausibly pleaded a hostile work environment claim because she has not pleaded sufficient facts to satisfy the fifth element.

D

Because Zuniga has not pleaded sufficient facts to satisfy two of the essential elements, she has not stated a plausible hostile work environment claim, and the City is entitled to dismissal of this claim.

IV

Although the court is granting the City's motion to dismiss Zuniga's hostile work environment claim, it will allow Zuniga to replead.

> In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

*In re Am. Airlines, Inc., Priv. Litig.*, 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.) (alteration omitted) (quoting *Great Plains Tr. Co.*, 313 F.3d at 329). It is not clear that the defects in Zuniga's hostile work environment claim are incurable, and Zuniga has requested leave to amend.

\* \* \*

For the reasons explained, the court grants the City's motion to dismiss and also gives Zuniga leave to file a first amended complaint within 28 days of the date this memorandum

opinion and order is filed.

    **SO ORDERED**.

    January 23, 2024.

                                                     SIDNEY A. FITZWATER
                                                   SENIOR JUDGE